Shaucic, J.
For three independent reasons counsel for the guaranty company insist that the court of common pleas erred in rendering-judgment against it. Although the judgment was reversed by the circuit court for but one of these reasons, counsel insist here, as they may, that the reversal should have been upon all of the grounds of error alleged. They urge that the action could not be maintained because the time limited by the terms of the indemnifying contract for the discovery of the defaults had been exceeded. The stipulation of the bond is that the company shall make good “such pecuniary loss as may be sustained by the employer by reason of the fraud or dishonesty of the said employe in connection with the duties of his office or position amounting to embezzlement or larceny, and which shall have been committed during the continuance of said term or any renewal -thereof and discovered during *277 said continuance or any renewal thereof, or within six months thereafter.”
The acts of Spear which resulted in loss to the bank were committed prior to February 5, 1904, that is, within the period covered by the original bond, and they were not discovered until more than six months after that date. It is entirely clear that if the question involved a consideration alone of the terms of the original bond, the time limited for the discovery has been exceeded. But the terms of the original bond show that when it was executed, a renewal or continuation thereof was contemplated, and an instrument was executed whereby the company continued in force “the original bond subject to its covenants and conditions until- February 5, 1905.” It is obvious that these instruments are to be construed together; not only because they relate to the same subject-matter, but because each in terms refers to the other. On this point counsel are agreed. In favor of the obligee it is insisted that the instruments thus construed are, in legal effect, the same as though the original bond had been executed for two years instead of one, and that this view must determine all questions respecting the rights and liabilities of the parties, so that the company shall be liable for a single penalt)'-, and there is a continuance for a year of the period in which Spear’s default might create a liability for that penalty, as well as for the time of its discovery.
In favor of the obligor it is insisted that however it would be as to other questions which might arise, .there should, with resnect to the question presented, be such construction as would be re *278 quired by an express stipulation that notwithstanding the continuance, a liability on account of a default occurring within the first year should be conditioned upon the discovery of that default within six months after the end of that year. There being no such express stipulation we have to inquire whether it is implied in the natural meaning of the words used and their grammatical and logical relation. It might be conjectured that the parties regarded the word “renew” used in the first instrument as synonymous with the word “continue” used in the second. But there need be no resort to conjecture since what the parties did in the second instrument was “to continue in force the former instrument for the period beginning the 5th day of February, 1904, and ending on the 5th day of February, 1905, subject to all the covenants and conditions of said original bond.” By the material stipulations of the original bond the obligor undertook to make good any loss which the obligee might sustain by reason of the fraud or dishonesty of its cashier “committed during the continuance of said term or any renewal thereof and discovered during said continuance or any renewal thereof, or within six months thereafter.” Here are no words of severalty or discrimination respecting the time of the discovery, and since it would not be within the proper function of interpretation to supply such words, the terms of the stipulation must be regarded as within the same construction. This view is enforced by the consideration that the term during whose continuance a default was contemplated by the original instrument is the term which was continued by the *279 express terms of the second. No terms are used to suggest that any difference in the relation of the parties was intended by the second instrument than such as would have existed if the original bond had been for two years. It is conceivable that if this question had been anticipated by the parties at the time of the execution of these instruments, clearer terms would have been used to express their intention with respect to it. But certainly in view of their stipulations, nothing more favorable to the obligor can be concluded than that an interpretation against it is doubtful. ■It being entirely clear that within the contemplation of both parties their stipulations were for the purpose of affording indemnity to the obligee, all substantial doubts with respect to the meaning of the terms they employ should be so resolved as to effectuate that obvious intention. That rule of interpretation is familiar and it is illustrated in cases cited in the briefs.
Coupsel for the obligor further insist that the default of the cashier was neither embezzlement nor larceny, and that, therefore, it was not within the terms of its obligation to make good “such pecuniary loss as may be sustained by the employer by reason of the fraud or dishonesty of said employe * * * amounting to embezzlement or larceny.” The parties were stipulating for the indemnity of the obligee. They were not concerned with the enforcement of the criminal laws of the state. It was not intended to indemnify against loss from the cashier’s negligence or bad judgment. They adopted as descriptive of the misconduct contemplated, the phrase fraud or dis *280 honesty amounting to embezzlement or larceny. If only indemnity on account of conduct amounting to technical embezzlement or larceny had been intended that intention would have been naturally expressed more clearly in fewer words. Certainly we should not reach the correct conclusion with respect to this question if we should deny all effect to the words “fraud or dishonesty amounting to,” which denial is involved in the argument of counsel for the obligor. It is very likely true that the cashier did not expect or intend that- the bank should suffer loss from his transactions with Chadwick. She had doubtless quickened the pulsation of his 'venerable heart with dazzling stories of her enormous wealth, and he reached the conclusion, usual in such cases, that he could fraudulently and dishonestly exercise his authority as cashier to his own pecuniary advantage, and without loss to the bank. The fraud, dishonesty and misuse of his authority as cashier were intended. That his conduct was for gain is the only motive suggested by the circumstances. If his own admission to that effect is not properly shown in the record, or if it is not competent in this case, that motive is clearly shown by the letter of Chadwick presented in the record, in which, during these transactions she effectively solicited the false certification of a check for a large amount, proposing as an inducement “I will pay you and Mr. B. well for this favor — and I am sure it will be safe.” To this the.only answer from counsel is, that there is no evidence that Spear ever realized any financial gain from these transactions. The reply may be as brief as the answer. *281 Motive and intention may be as well shown by the hope of illicit gain' as by its realization. A decision in favor of the guaranty company upon this ground would imply that its business in this state consists in the collection of premiums.
A third proposition made by counsel for the obligor, if it is sound, justifies not only the reversal of the judgment' of the court of common pleas, but also the final judgment in favor of the guaranty company which the circuit court rendered. The proposition is that the facts which were conclusively established upon the trial showed that the obligee had failed to comply with the terms of the bond imposing upon it a duty in the following terms: “Provided that on the discovery of any act capable of giving rise to a claim hereunder the employer shall, at the earliest practical moment give notice thereof to the company.” The parties did not see fit to fix a definite date, or the time within which notice should be given to the company. In lieu of such precise stipulation they fixed the day for the giving of the notice by the flexible phrase “at the earliest practical moment.” By this they doubtless meant that the notice should be given as soon as it would be practicable to give it.- In determining the effect of this stipulation it must be assumed that the parties contemplated every consideration by which the minds and conduct of those representing the bank would naturally be affected, the character of the misconduct of the cashier which would create liability upon the bond, a precise comprehension of the requirement that it must be fraud or dishonesty amounting to embezzlement or larceny, *282 the caution which prudent men would exercise in making so grave a charge against one who had been highly esteemed for integrity, as well as the confusion and doubt which would arise from the intervention by the Federal authorities to perform their duties, as prescribed by the law, under which the bank was organized and conducted. Obviously flexible terms were used because it was at the time of making the contract impossible to foresee all of the considerations which would naturally and, therefore, properly, determine the time when notice should be given. While counsel for the obligor claim too much from the evidence respecting discoveries made by the directors on November 30, 1904, it does appear that upon the evening of that day, which was Sunday, one of the directors called a meeting at his office. Fie called the meeting in view of the fact that upon the previvous day depositors had withdrawn money from the bank in unusual amounts and the cashier had upon that day expressed to him the opinion that the bank had become insolvent from the transactions with Chadwick. The object of the meeting was to determine whether the bank should open on the following day. No other purpose was contemplated in the call. At that meeting there was submitted the admission of the cashier to one of the directors that credit amounting to $240,000 had been extended to Chadwick, not upon collateral security furnished by her, but in reliance upon her ownership of more than two millions of securities which she represented she had on deposit in Cleveland, the expectation of the cashier and pres *283 ident that they would profit by these transactions, and that in his opinion the bank had become insolvent in consequence thereof. The correspondence with Chadwick at the time of these transaction was not present, nor was there conclusive evidence of the falsity of her representations as to her wealth. On the following day the condition of the bank was reported to the Comptroller of the Currency, who promptly took possession of the bank. Investigations by experts followed, the facts now known were conclusively ascertained, and on January IS, notice was given to the guaranty company. The attention of the directors at the meeting of November 30, was naturally confined to the only question they were called to consider, whether the bank should be opened on the following day. That question pressed for immediate determination. They were not then informed of the inculpating evidence contained in the subsequently discovered letters of Chadwick, nor of the details of the Chadwick transactions, nor of the later ascertained certainty that they had rendered the bank hopelessly insolvent. Even’ if all these facts had been known and considered at that meeting it would be natural, and, therefore, within the contemplation of the parties to the bond, that the directors by seeking the advice of counsel, and otherwise should exercise great caution before making so grave a charge as the notice would imply. These views are entirely consistent with those,relating to similar stipulations as construed in cases cited in the briefs. The obvious sincerity with which counsel *284 for the company, even in the light of all that is now known, insist that there was no “act capable of creating a liability” under the bond, strongly suggests that the course taken by the directors was reasonable and natural. The rights and liabilities of the parties to this action are fixed by contract, and we need not advert to any of the cited cases which have been determined by a consideration of rules governing the relation of officers of banks to their stockholders and depositors. For the reasons stated the trial judge properly regarded the question of timely notice as one to be determined by the jury. It would not have been more obviously so if the stipulation had been for notice within a reasonable time.
The contention of counsel for the obligor is rather that the facts relating to the subject of notice were, as to their existence and significance, so clearly established that it was the duty of the court to decide that timely notice had not been given, which view we think erroneous for the reasons already given. It does not seem to be, nor could it well be claimed, that in the submission of this question to the jury the court erred to the prejudice of the obligor. It was said in the charge “earliest practical moment does not mean instantly, but it does mean very soon. , If the bank on November 30, knew of such acts of Spear as required notice to be given under the foregoing instructions, then notice in January would not be at the earliest practical moment. Whenever any discovery was made, which required notice, the. representative of the bank should have acted promptly and *285 quickly and reasonably under all the circumstances, and it is for you to determine from all the evidence in the case just when the discovery was made, when notice was given, and whether or not notice was given at the earliest practical moment after the discovery.” Certainly the obligor could not complain of the terms in which the obligation of the bank was thus stated.
Upon these views we conclude that the judgment of the circuit court was not justified by the reasons which it gave, nor for any other reasons apparent upon the record.
The judgment of the circuit court will be reversed and that of the common pleas affirmed.

Judgment reversed.

Davis, C. J., Spear, Johnson, Donahue and O’Hara, JJ., concur.